IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| LEKEI PATEL, ) | |
| ) | |
| Relator/Plaintiff, ) | |
| ) | Case No. 7:19-cv-516 |
| v. ) | |
| ) | By: Michael F. Urbanski |
| VIRGINIA PREMIER HEALTH ) | Chief United States District Judge |
| PLAN, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

This matter comes before the court on Defendant Virginia Premier Health Plan, Inc.'s ("Va. Premier's") motion to dismiss Plaintiff Lekei M. Patel's Second Amended Complaint ("SAC"), ECF No. 52, for failure to state a claim upon which relief can be granted. ECF No. 56. The parties have requested that the court rule on the pleadings. For the reasons explained herein, the court **DENIES** the motion to dismiss.

**I.**

On July 23, 2019, Patel filed her original complaint against Va. Premier. See ECF No. 1. Va. Premier filed a motion to dismiss for failure to state a claim. ECF No. 33. In response, Patel moved to voluntarily dismiss Counts I through VIII of the First Amended Complaint ("FAC"), ECF No. 36, and opposed the motion to dismiss Count IX. See ECF No. 45. The court granted Patel's motion to voluntarily dismiss Counts I through VIII with prejudice as to Patel, but without prejudice as to the United States and the Commonwealth of Virginia. See ECF No. 51. The court also dismissed Patel's False Claims Act (FCA) retaliation claim (Count IX), but granted her leave to amend her complaint as to that claim. See id. After Patel filed her

1

SAC, Va. Premier again moved to dismiss the FCA retaliation claim for failure to state a claim under Fed. R. Civ. P. 12(b)(6). See ECF No. 56.

## II.

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). At this stage, the court must accept as true all well-pleaded allegations and draw all reasonable factual inferences in the plaintiff's favor. Erickson v. Pardus, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation and quotation marks omitted). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

## III.

Patel alleges the following facts in support of her FCA retaliation claim. The Virginia Department of Medical Assistance Services ("DMAS") implemented a program called Commonwealth Coordinated Care Plus ("CCC Plus") on August 1, 2017, as part of a state plan for medical assistance services. SAC, ECF No. 52, at 2. DMAS contracted with six Managed Care Organizations ("MCOs"), including Va. Premier, to provide CCC Plus services. Id. at 3. Va. Premier then began to provide "Medicaid managed long term services and supports" to members of CCC Plus. Id. DMAS pays a capitation payment to Va. Premier

monthly as payment for services provided and administrative costs. Id. The capitation rate is based on data provided by MCOs and DMAS and includes factors such as eligibility group, locality, and level of care. Id. The total monthly payment from DMAS to Va. Premier is based on the number of members Va. Premier served and the capitation rate associated with those members. Id. at 4.

On January 1, 2018, DMAS started to withhold 1% of all payments made through its CCC Plus Program, which was a "quality withhold tied to sufficient reporting of core quality measures[.]" Id. From July 1, 2018 to December 31, 2018, it was tied to reporting of CCC Plus members. Id. at 4–5. If MCOs reported sufficient data, they were entitled to earn back the 1% quality withhold, but if they did not, they forfeited the quality withhold for 2018. Id. at 5. DMAS required the Medicaid contractors participating in CCC Plus to have "care coordination staffing ratios that ensure compliance with all required care coordination activities required under th[eir] contract" with DMAS. Id. From August 1, 2017 to December 31, 2018, the maximum ratio for care coordinators of CCC Plus Waiver participants (Level 3s) was 1:70, and on January 1, 2019, it increased to 1:75. Id. For care coordinators of Emerging High-Risk members (Level 2s), the ratio from August 1, 2017 to 2019 was 1:400. Id. at 6. DMAS required the MCOs to provide reports each month demonstrating their compliance with these ratios. Id.

Va. Premier was also required to provide benefits to CCC Plus HCBS Waiver members including Personal Emergency Response Systems ("PERS"), Assistive Technology ("AT"), and Environmental Modifications ("EMs"). Id. Va. Premier was supposed to assist members in accessing these services. Id.

3

Patel was hired by Va. Premier on or about January 17, 2018 as a Level 3 Long Term Service and Support Specialist serving CCC Plus Waiver Populations in the Roanoke, VA location. Id. at 7. "A Level 3 assists high-risk Medicaid recipients and their family members to resolve issues related to the members' care." Id. Each Level 3 has a caseload of members that they are expected to assist, and when Patel was interviewed, her supervisor told her that her caseload would consist of about 70 members. Id. Patel alleges that her first caseload actually consisted of about 170 members. Id. Only four of the 19 Level 3s in the Roanoke office had caseloads below the DMAS limit of 70. Id. at 8. Several Level 3s had caseloads exceeding 100 members, and three or four Level 2 care coordinators had caseloads exceeding 400. Id. Starting in June 2018, Patel repeatedly complained to her supervisors and human resource officers about how the company was defrauding the United States and Virginia by assigning her and other care coordinators caseloads that exceeded the ratios permitted by DMAS. Id. Specifically, on or about June 14, 2018, Patel complained to Va. Premier's Senior Human Resources Generalist Brittany S. Wooden about the "excessive and unlawful care coordination staffing ratios." Id. at 9. She repeated these complaints to Wooden on July 31, 2018. Id.

Patel also complained about Va. Premier's refusal to process AT and EMs applications for its members even though it was required to "assist its CCC Plus Members in accessing [these] services." Id. at 10 (citing Exhibit 3, at 342). Va. Premier did not instruct its care coordinators on how to apply for these funds on behalf of their members. Id. In a training session on July 18, 2018, Patel asked Va. Premier's Director of Health Services MLTSS, Andrea Brodman, how to apply for EMs on behalf of a member, but Brodman told her not to "promote" this program because not providing it helps Va. Premier save money. Id. at 10–

4

11. Patel replied that the money was there for members and her member needed it to make her house safer to continue to live in. Id. at 11. Yet, none of the supervisors at the training told the care coordinators how to apply. Id. Patel alleges that over the course of the following six months, she repeatedly alerted Va. Premier of its obligations to provide its members with access to EM and AT services and informed Va. Premier that not doing so was a material breach of its legal obligations. Id.

Va. Premier terminated Patel's employment on January 31, 2019, alleging that she submitted a fraudulent document to DMAS—a Member Note (Exhibit 30, "the Note") that she submitted after assessing an autistic member. Id. Patel had begun the assessment in November 2018, but worked on it again on January 2, 2019, and completed it on January 3, 2019. Id. On the November date and on January 2, 2019, she interacted with the member, but on January 3, 2019, she did not. Id. at 12. This Note described the member and included present tense observations, which Patel's supervisor, Nora Bell, misinterpreted to imply that Patel had observed the member on January 3, the same day she submitted the Note, thus leading Bell to conclude that the Note was fraudulent. Id.

Patel asserts that this claim of fraud was pretextual because she did not purport to have made any of the observations on the same day she submitted the Note. Id. To further support the claim that the purported reason for firing her was pretextual, Patel details actual and intentional fraud that was allegedly committed by Bell while employed by Va. Premier. See id. Patel alleges that fraudulent practices were common among Va. Premier's management. See id. at 13.

DMAS required Va. Premier to submit monthly reports indicating its level of

5

compliance with the 1:70 and 1:400 maximum care coordination ratios, and Va. Premier demonstrated awareness that it was bound by these ratios. Id. Patel inferred that Va. Premier had "intentionally and fraudulently reported staffing ratios for Level 3s that were at or below the 70:1 maximum" even when they were higher, and thus had "corruptly and falsely certified to DMAS that it was in compliance with the CCC Plus ratio requirements every week after February 7, 2018." Id. at 13–14. "Va. Premier also reported compliance with the Emerging High Risk coordinator [Level 2] ratio on all but two dates between August 7, 2017, and November 23, 2018." Id. at 14. On these two dates, Va. Premier reported a ratio of 352:1, but Patel observed that all the Level 2 coordinators had caseloads above 400. Id.

Patel alleges that Va. Premier knew that failure to comply with DMAS requirements "would result in the denial of payment of claims, suspension of Defendant's operations, termination of the CCC Plus Contract or disqualifying as a[n] MCO." Id. (citing Exhibit 3). Patel alleges that she believed that Va. Premier could be subject to penalties by DMAS if DMAS discovered that Va. Premier was filing false reports in violation of state and federal laws, including the FCA. Id. at 15. Patel believed that the allegedly false ratio certification statements were material to DMAS's decision to pay the one percent quality withhold to Va. Premier. Id. Patel also alleges that Va. Premier fraudulently stated that it was helping members access EMs and ATs even though it was discouraging coordinators from helping members access these services. Id. at 16. Patel believed Va. Premier was doing so to avoid paying administrative costs associated with these services. Id. She believed that DMAS would not have awarded and renewed the CCC Plus Contract for Va. Premier if it knew Va. Premier was not assisting members to access these services. Id. Patel alleges that DMAS paid claims it

would not have otherwise paid in the absence of the false certifications provided by Va. Premier. Id. at 17.

Patel contends that while she worked for Va. Premier, she did her job proficiently and Va. Premier "had no objective, legitimate or nonpretextual reasons to fire her." Id. Patel further alleges that her complaints about the staffing ratios and about the refusal to provide access to EMs and ATs were known to Va. Premier's managers and officers and that her complaints were intended to prevent and stop Va. Premier from "defrauding DMAS" and violating the law, "including the FCA and laws establishing and administering the Medicaid Program pursuant to 42 U.S.C. § 1396." Id. at 16–17. Patel alleges that she "was fired because of her good faith, protected activity." Id. at 18.

## IV.

Patel alleges that she was terminated in violation of the FCA, 31 U.S.C. § 3730(h). 31 U.S.C. § 3730(h) provides that if an "employee, contractor, or agent" is discharged as a result of "lawful acts done…in furtherance of an action under this section or other efforts to stop [one] or more violations of this subchapter," they are entitled to relief. 31 U.S.C. § 3730(h). To survive a motion to dismiss in a § 3730(h) retaliation claim, Patel "must allege facts to support a 'reasonable inference'" that "(1) she engaged in protected activity; (2) her employer knew about the protected activity; and (3) her employer took adverse action against her as a result." United States ex rel. Grant v. United Airlines Inc., 912 F.3d 190, 200 (4th Cir. 2018).

### A. Protected Activity

"[A]n act constitutes protected activity where it is motivated by an objectively reasonable belief that the employer is violating, or will soon violate, the FCA." Id. at 201.

Further,

> A belief is objectively reasonable when the plaintiff alleges facts sufficient to show that he believed his employer was violating the FCA, that this belief was reasonable, that he took action based on that belief, and that his actions were designed to stop one or more violations of the FCA. However, while the plaintiff's actions need not "lead to a viable FCA action"…they must still have a nexus to an FCA violation.

Id. at 201–02. "[T]he scope of protected activity under the FCA should be interpreted broadly." United States ex rel. Oldham v. Centra Health, Inc., 548 F. Supp. 3d 568, 576, 2021 WL 2910942 (W.D. Va. 2021) (citing Grant, 912 F.3d at 201).

In its motion to dismiss the SAC, Va. Premier argues that Patel has not sufficiently pleaded protected activity. Mot. to Dismiss, ECF No. 56, at 8. Va. Premier avers that Patel merely made "generalized complaints and frustrations about (1) her heavy workload, triggered by allegedly high care coordination staffing ratios, and (2) Virginia Premier's alleged failures to train its care coordinators to assist beneficiaries in applying for EM and AT-related funding." Id. at 9 (citing SAC, ECF No. 52, at Sec. H). Va. Premier claims that Patel has not added additional support to the allegations that were pled in the FAC and has instead cited to the same two instances she previously described. Id. Specifically, those instances were (1) when she complained to HR that her caseload was higher than permitted by Va. Premier's contract with DMAS, and (2) the training session on July 18, 2018 when she asked her supervisors how to apply for EMs on behalf of a member, but was told not to promote the program. Id. (citing FAC, ECF No. 5, at ¶¶ 40, 43; SAC, ECF No. 52, at ¶¶ 40, 43). Va. Premier emphasizes that Patel's allegation that she "continuously and reasonably" "protested and complained" is not enough to save her retaliation claim because it is a "threadbare recitation of the elements of an FCA retaliation claim[.]" Id. (citing SAC, ECF No. 52, at ¶¶ 37–40). Va. Premier also argues

8

that the SAC's allegations fall below the pleading standards of Grant. See id. (citing Grant, 912 F.3d at 190).

Patel responds by asserting that she does make a prima facie showing of protected activity "within the broad sweep of the second prong of Section 3730(h)" because she reasonably concluded that Va. Premier falsely certified to DMAS that it was in compliance with its contractual staffing ratio requirements. Opp. to Mot. to Dismiss, ECF No. 57, at 6 (citing SAC, ECF No. 52, at ¶¶ 57–61). The monthly reports certifying compliance were required for payments under Medicaid. Id. (citing SAC, ECF No. 52, at ¶¶ 59–61, 65). Patel claims that her complaints were that the reports violated both the contracts and the regulations promulgated by DMAS. Id. Patel also avers that even if the ratios were only contractual, "[a]n expressly or implicitly false certification by a government contractor to a state agency is a quintessential FCA violation" especially when the certifications are required in order to be paid public funds. Id. (citing Universal Health Services v. United States ex rel. Escobar, 579 U.S. 176, 181 (2016)).

In Grant, plaintiff Grant alerted United, his employer, to "numerous aircraft maintenance violations[.]" Grant, 912 F.3d at 202. Grant "complained on multiple occasions in person and in writing" about the alleged violations. Id. Grant's "complaints did not merely express concern about regulatory non-compliance, but instead alleged specific illegal, fraudulent conduct against the government." Id. The Fourth Circuit found that it was objectively reasonable for Grant to believe that United committed fraud. Id. The Fourth Circuit also found that the SAC supported a reasonable inference that Grant's actions were meant to stop violations of the FCA because Grant "observed United coercing investigators

9

to falsify engine repairs" and he sent an email with supporting documents to management about the practice. Id.

In Oldham, plaintiff Dr. Oldham alleged that his former employer, Centra, retaliated against him in violation of the FCA for investigating Centra's "unusually high utilization rates for several forms of oncology testing." Oldham, 548 F. Supp. 3d at 571. The court found that Oldham sufficiently alleged that he engaged in protected activity because he "repeatedly made complaints about fraudulent activity and took steps to investigate the misconduct." Id. at 576. Oldham tried to eliminate unnecessary testing and reduce unnecessary breast imaging and eventually "told a co-worker that he was preparing to file complaints" against some of the company executives. Id. Oldham believed that Centra was planning to participate in the Oncology Care Model, which requires that organizations demonstrate cost savings as a result of quality improvement, while continuing to over-utilize testing and imaging and neglecting to make any improvements. Id. at 573, 576. Therefore, the court held that Oldham's complaint included enough factual allegations to lead to a reasonable inference that Oldham reasonably believed Centra was violating the FCA and that he tried to stop those violations. Id. at 576.

Here, Patel sufficiently alleges that she engaged in protected activity. Patel believed that Va. Premier was violating the FCA in two ways: 1) by reporting fraudulent care coordination ratios to DMAS, and 2) by falsely representing that Va. Premier was assisting its members in applying for EMs and ATs even though it was discouraging its care coordinators from doing so. See SAC, ECF No. 52, at 14, 16. And the SAC adequately shows that this belief was reasonable. Patel believed that Va. Premier was reporting false care coordination ratios to DMAS because she knew that the ratios were over the limit set by DMAS. See SAC, ECF No.

10

52, at 8, 15, 17. Patel knew that not complying could lead to penalties for Va. Premier, but she did not observe Va. Premier being subject to any penalties. See id. at 15–16. Thus, it was reasonable for Patel to conclude that Va. Premier was not reporting the real care coordination ratios to DMAS. See id. Patel also knew that reporting false numbers would be fraudulent, so it was reasonable for her to conclude that Va. Premier was violating the FCA by committing fraud. See id. Furthermore, Patel believed that Va. Premier was "knowingly and fraudulently" telling DMAS that Va. Premier was assisting members in accessing EMs and ATs even though it was discouraging its care coordinators from helping members apply for these services. Id. at 16. Patel formed that belief because she thought that DMAS would not renew the CCC Plus Contract with Va. Premier each year if DMAS knew that Va. Premier was refusing to provide access to EMs and ATs, yet the Contract was renewed. Id. Like in Grant, Patel's concerns did not "merely express concern about regulatory non-compliance, but instead alleged specific illegal, fraudulent conduct against the government." See Grant, 912 F.3d at 202.

Further, Patel adequately shows that she took action based on her belief that Va. Premier was violating the FCA and that her actions were designed to stop one or more FCA violations. Patel alleges that she acted based on that belief on multiple occasions, including on June 14, 2018, when she "expressly and explicitly complained about [the] excessive and unlawful care coordination staffing ratios to Va. Premier's Senior Human Resources Generalist Brittany S. Wooden" and "repeated her complaints and protestations to Ms. Wooden on or about July 31, 2018." Id. at 9. Patel then alleges that she continued to raise the "subject of fraud" "in a series of conversations, communications, and conferences with Va. Premier managers, agents, and employees[.]" Id. at 9–10.

11

Patel also alleged that she "complained about Va. Premier's refusal to process AT and EMs applications for its members." SAC, ECF No. 52, at 10. Patel claims that at a training session on July 18, 2018, she asked Brodman how to apply for EMs on behalf of a member. Id. When Brodman told her not to promote the program, Patel responded that the money was there for the members and that her member needed it to make her house safer to continue to live in. Id. at 10–11. Patel alleges that over the next six months, she "continuously alerted management that the Defendant was obligated to provide its membership with ready access to EM and AT services" and that Va. Premier's refusal to do so "was a standing, material breach of those legal obligations." Id. Like in Oldham, Patel "repeatedly made complaints about fraudulent activity[.]" See Oldham, 548 F. Supp. 3d at 576. As in Grant, Patel brought her concerns about her employer's practices to management. See Grant, 912 F.3d at 202. Taking these allegations as true, Patel acted based on her belief that Va. Premier was violating the FCA and tried to stop the violations from continuing to occur.

Therefore, with respect to both her complaints about the care coordination staffing ratios and the refusal to provide members with access to ATs and EMs, Patel has adequately alleged that she engaged in protected activity.

### B. Employer's Knowledge of Protected Activity

A plaintiff in a retaliation claim must also prove that their employer knew about the protected activity. Id. at 200. "This element is met when the employee's words and acts are sufficiently suggestive of fraud or falsity such that the employer knew or should have known that FCA litigation was a reasonable possibility." Mason v. Netcom Technologies, Inc., No. 8:20 -CV-03558-PWG, 2021 WL 4286535 (D. Md. Sept. 21, 2021) (internal citation omitted).

"[U]nder the FCA, actual knowledge of a plaintiff's protected activity is not required." Oldham, 548 F. Supp. 3d at 577 (internal citation omitted).

Va. Premier again argues that Patel's alleged complaints merely concerned contractual requirements, not regulatory or statutory requirements. Mot. to Dismiss, ECF No. 56, at 15. Va. Premier also argues that DMAS knew what Va. Premier's caseload ratios were, yet Patel did not plead that DMAS took any action in response to the alleged noncompliance. Id. Va. Premier further contends that Patel only alleged that she questioned why she and other case managers were not being trained on providing EMs without alleging that Va. Premier was engaging in fraud as to EMs and/or ATs. Id. Therefore, Va. Premier reasons, Patel's allegations do not create a reasonable inference that Va. Premier knew Patel was taking part in protected activity. Id. at 15–16.

Patel, on the other hand, contends that she satisfied this requirement by alleging that "she complained repeatedly to upper management" that the staffing ratios were unlawful and that the monthly reports to DMAS were fraudulent. Opp. to Mot. to Dismiss, ECF No. 57, at 9 (citing SAC, ¶¶ 37, 40, 70–71). In Grant, the Fourth Circuit held that Grant's complaints to upper management sufficiently showed that United knew about his protected activity. See Grant, 912 F.3d at 203. Likewise, Patel's reports to upper management were sufficient to put Va. Premier on notice, satisfying the knowledge element.

C. **Adverse Action/Causation**

An employer has taken adverse action against an employee that exposes it to liability for retaliation if it does something that "may have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 203 (citing Smith v. Clark/Smoot/Russell,

13

796 F.3d 424 (4th Cir. 2015) (internal quotation omitted)). There must be a causal connection between the employee's termination and the alleged protected activity, which "can be inferred from a brief lapse of time between the protected activity and the adverse employment action." Mason, 2021 WL 4286535 at *5. Even though there isn't a bright-line rule for temporal proximity, "a lapse of over three months between the protected activity and the alleged retaliation is too long to give rise to an inference of causality." Westmoreland v. Prince George's Cnty., Md., D. Md. No. 09-CV-2453 AW, 2010 WL 3369169, *10 (D. Md. Aug. 23, 2010). Without additional evidence, a three-month gap is not sufficient to show causation. Mason, 2021 WL 4286535 at n. 5.

Va. Premier argues that Patel has not sufficiently pled that retaliation was the cause of the adverse action taken against her (her termination) because she was fired six months after allegedly complaining about the care coordination staffing ratios and six and a half months after asking why she and other care coordinators did not receive training on applying for EMs and ATs. Mot. to Dismiss, ECF No. 56, at 16–17. Va. Premier contends that this is too long to create an inference of causality. Id. at 17 (internal citation omitted). Moreover, Va. Premier argues that Patel's allegations of "ongoing" complaints are not enough to cure the six-month gap because these allegations do not contain the required level of detail. Id.

Patel avers that "she repeated her objections to Va. Premier's misconduct on a succession of occasions between July 2018 and January 2019[,]" and that these ongoing protected complaints are enough to support causality. Opp. to Mot. to Dismiss, ECF No. 57, at 11. Patel also argues that the circumstances surrounding her firing, specifically her strong performance in her job and the "pretextual and false rationale" for her termination, create an

14

inference of retaliation. Id. Patel argues that Va. Premier's given reason for her termination, that she submitted a fraudulent record, was a pretext to fire her for her complaints that Va. Premier was defrauding DMAS. Id. at 12.

The six-month gap between the last specific date that Patel claims she lodged complaints (July 31, 2018) and her termination (January 31, 2019) is double the three-month time gap at which the Fourth Circuit says causation can be inferred. See Westmoreland, 2010 WL 3369169 at *10 (citing Pascual v. Lowe's Home Ctrs., Inc., 193 Fed. App'x 229, 233 (4th Cir. 2006)). Therefore, without more, the court cannot infer that Patel's protected activity was the but-for cause of Patel's termination. See Mason, 2021 WL 4286535 at n. 5.

In Mason, plaintiff Mason submitted a claim to the Department of Labor (DOL) in August 2019 and was terminated on November 25, 2019. Id. at *5. Though this was "on the edge of temporal proximity that courts have found sufficient to support a claim[,]" Mason provided other evidence relevant to the issue of causation. See id. Mason identified two instances of "retaliatory animus" by Netcom—1) his termination six days after receiving back pay that the company owed him (and that was the subject of his DOL complaint), and 2) a September 24, 2019 meeting where Netcom's CEO made unusual comments to Mason, including stating that he had "no animosity [towards Mason]." Id. at *6. Furthermore, Mason provided a reason for the three-month delay—the defendant deliberately waited to terminate Mason until the DOL completed its investigation and Mason received his backpay because the defendant wanted to avoid further potential consequences. Id. The court concluded that after construing factual inferences in Mason's favor, it was objectively reasonable to infer that his complaint to the DOL was the cause of his termination. Id.

15

In Westmoreland, plaintiff Westmoreland sued her employer, Prince George's County, Maryland, for retaliation in violation of the FCA after she filed an internal complaint. Westmoreland, 2010 WL 3369169 at *1. The court found that for Westmoreland's second retaliation claim, retaliatory intent could not be inferred because Westmoreland filed an internal complaint on June 30, 2006, and received a negative performance evaluation on October 13, 2006, so there was too much time between the two events. Id. at *10. However, the court found that two intervening events "might give rise to a showing of retaliatory animus." Id. Those events were Defendant's July 3, 2006 attempt to transfer Westmoreland out of the EMS Training Academy ("the Academy") and Defendant's successful October 10, 2006 involuntary transfer of Westmoreland out of the Academy. Id. Westmoreland also had alleged that her negative performance evaluation was written by Mr. Gross, the supervisor against whom she filed her internal complaint, which the court found created an inference of retaliatory animus. Id. The court also found that allegations of "recurring retaliatory animus" and specific events to support those allegations, including the two discussed supra, were enough to preserve Westmoreland's second, third, and fourth retaliation claims. Id. at 10–12.

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000), cited by Patel, stands for the proposition that it is permissible for a trier of fact to infer discrimination if the employer gives a false reason for the adverse employment action—it does not say that retaliation can be inferred. Sempowich v. Tactile Systems Technology, Inc., 19 F. 4th 643, 653 (4th Cir. 2021), also cited by Patel, provides that when a plaintiff makes a claim of retaliation under Title VII, a factfinder must apply the burden-shifting framework to determine whether retaliation took place. The burden-shifting framework is not used for FCA retaliation claims.

16

Finally, a third case cited by Patel, Haynes v. Waste Connections, Inc., 922 F.3d 219, 225 (4th Cir. 2019), holds that "a plaintiff may show that an employer's proffered nondiscriminatory reasons for termination" are false to show pretext for discrimination under Title VII—it does not discuss the FCA.

Here, there is a gap of more than three months from the last concrete date that Patel said she complained (July 31, 2018) and the date that she was terminated (January 31, 2019). See SAC, ECF No. 52, at 9, 11. However, like in Mason, Patel offers "more" by providing additional evidence on the issue of causation. See Mason, 20212021 WL 4286535 at *5. Patel asserts that she complained about the alleged fraud repeatedly in the six months leading up to her termination. See SAC, ECF No. 52, at 9–10. Therefore, the gap between her last complaint and her termination could have been fewer than three months. Under Rule 12(b)(6), a plaintiff must simply state a claim for relief that it plausible on its face. Iqbal, 556 U.S. at 678. Accepting as true the allegation that Patel raised her concerns repeatedly in the six months leading up to her termination, it is plausible that her complaints were the cause of her termination. Like in Westmoreland, where the court found that allegations of recurring retaliatory animus were sufficient, Patel's allegations of repeated and continuing complaints are enough to allow her retaliation claim to survive a challenge at the pleadings stage. See Westmoreland, 2010 WL 3369169 at *10–12.

Patel also offers evidence that the reason given for her termination was not legitimate. Patel explains that she was fired for a purportedly fraudulent patient report, but the report was not actually fraudulent. SAC, ECF No. 52, at 12. Patel elucidates that the report was one she submitted after assessing an autistic member. Id. at 11. The report included present tense

17

observations, including that "[t]he member is well groomed and requires prompting and social cueing." Id. (citing Ex. 30). Bell interpreted the statement to imply that Patel had observed the member on the day she submitted the report. Id. at 12. Since Patel did not observe the member on the day she submitted the report, instead observing him on two prior occasions when she also worked on the report, Bell reported Patel for submitting a "fraudulent" document to DMAS, and Patel was subsequently terminated. Id. at 11–12.

Patel additionally details alleged fraud committed by Bell while employed by Va. Premier. Patel alleges that "[i]n March 2019, Bell completed an expense report for an employee based on the previous year's mileage data, signed the employee's name to it and backdated it, then signed her own name to it and dated it, and submitted the document." Id. at 12. The values on the report were allegedly excessive, the employee had not even traveled during the period in question, and the form was backdated to make it look like it was completed earlier. Id. Patel claims that "this practice was common among Va. Premier's management." Id. (citing Ex. L). Bell allegedly refused to respond when the employee confronted her, and agents and accounting employees of Va. Premier allegedly told the employee to keep the money when the employee reported the fraud to them. Id. at 12–13.

Bell's own alleged fraud, the response of other employees to Bell's alleged fraud, and the fact that the language in Patel's report was ambiguous and not suggestive of intentional fraud, supports a reasonable inference that Patel's allegedly fraudulent report was not the true reason for her termination, and that she was instead terminated because of her protected activity. See Mason, 2021 WL 4286535, at *6 (holding that after construing factual inferences in Mason's favor, it was objectively reasonable to infer that Mason's complaint to the DOL

was "causally linked to his termination."). Therefore, the court finds that Plaintiff has sufficiently plead causation and satisfied the third element of her FCA retaliation claim at the pleadings stage.

### III. CONCLUSION

Accordingly, the court **DENIES** the defendant's motion to dismiss. An appropriate order will be entered.

Entered: July 5, 2022

Michael F. Urbanski
Chief United States District Judge